Good morning, Your Honors. My name is Gary Menke. I represent Appellant Jeffrey Toney. I'd like to reserve four minutes for rebuttal, please. So your clock shows you your full time, so just kind of watch the clock and we'll try to signal you. Thank you. For two main reasons, the district court was wrong to dismiss Mr. Toney's employment discrimination under Washington state law. The first reason is that the Washington law against discrimination contains a unique and broad standard of liability under which it's rarely appropriate to grant summary judgment. The second reason is that on this record, there were competing inferences of discrimination and nondiscrimination. That is, under Washington law, that a substantial factor behind the firing of Mr. Toney was either his age, his gender, or his race. So if I can try to pare down, so the race claims, it's my understanding you have two comparators who are both white. So how does the race discrimination claim survive? Yes, Your Honor, we think it still survives in the context of the DEI policies that Clorox was implementing. So it was kind of this broad desire that appeared to be implemented to meet certain... But white individuals got the job, so how did the DEI policies play a role in that? We think it supports an inference that although the comparators are relevant to the age discrimination and gender discrimination claims, we also think even without those, that that broader context illustrates that it was kind of a check the box thing. I guess I'm a little bit confused why you would advance it. I mean, you've got more, as you just acknowledged, you've got more direct evidence of the other theories, so why bother arguing about race? Because that's a claim that he believed was supported by the facts, Your Honor, and he believed it was important to highlight that under the framework that Clorox was using, that had he been of a different race, he believes the outcome would have been different. So he's arguing that if he was 63 and a male, but if he had been black, then they might have retained him. That's right, and we believe that we're acknowledging that there is circumstantial evidence supporting competing inference, and Clorox has done a capable job of advocating for its side, and we can see how the argument would play out in front of the jury. But ultimately, that there's a competing inference, that given that context in which this decision took place, you're exactly right, Your Honor, had he been 63 and male, but a person of color... The material issue of genuine fact, both as to race and age, I mean, so race, the comparators are also white, and in age, the fact that the two ladies that were retained were younger, apart from them just being younger, what evidence do you have to create a genuine issue of material fact? So as to age as opposed to, say, his gender? I'm reserving the sex claim. I think that's unique, but I want to focus just on the race and the age. That the age claim is supported by the comparators, and that that is relevant evidence that allows a reasonable inference that his age was a substantial factor. Just their ages alone, and that's good enough to create an issue of fact as far as you're concerned? Yes, Your Honor, under the substantial factor test under Washington law. So every time a person gets fired and a younger person gets put in their position, there's a jury question? No, Your Honor. We're not advocating for that broad of a standard. I thought that's what you... because he was asking you, what is the evidence that creates the inference for a jury that there was age discrimination, and your answer was comparator evidence and nothing else. I think that there's two things to look at that I think that are the most compelling pieces of evidence. The first is the strength of that comparator evidence, that this was a person who was highly performing. He had the largest sales desk at Clorox. He had met all of his sales goals. He had introduced new products into Costco that you can see to this day when you walk the aisles of Costco. Lurts Hidden Valley Ranch Seasoning or Club Packs of Burt's Bees lip balm. And then the other thing is the DEI policies and that desire to set representation targets was coupled with Clorox funding these employee resource groups, which come under other names and other contexts like affinity groups. Let's break those apart here. So at first I thought you were arguing and you argued below about Clorox's index targets. And as I understand it, and correct me if I'm wrong, the index targets are merely sort of a gauge of just how the employees feel about the company and whether they like the place or not. It has nothing to do with targets in terms of quotas or goals or anything like that. Am I correct on that? The representation targets I think have been the... So again, I'm trying to be very specific. The index targets, there's two things in this policy. There's representation targets and there's index targets. The index is they're trying to gauge how well the employees feel about Clorox. The representation targets are a little more problematic, and I'll go into that with both of you all. I want to focus just on the index targets. How is that any evidence to support you getting to a jury in this case under any of the three theories that you're advocating? Your Honor, I think it's a piece of the puzzle. If that was all that we had, I don't think that that would be enough. But it's a piece in the puzzle. So if we look at the DEI program that it had, it's the representation targets. It's the Clorox-funded and designed employee resource groups. Now, you're fine with the resource groups. Let's tackle that one apart from the policy. The resource groups, as I understand it, is employees, regardless of ethnicity, race, sexual orientation, religion, anybody can join anybody else's resource group. Is that correct? That's Clorox's perspective. Well, do you have anything to defeat that? Well, I think one of the things is that there's an indication in the policy that part of the reason that these groups were formed were business demand. In other words, that these were led by Clorox. These are the groups that we want to have. How did that impact? How did that play a role in the decision not to keep your client? I'm talking just about the resource groups. Yeah, it's part of, again, I think if that were the only piece of the puzzle, that that wouldn't be enough. But it's one of the pieces of the puzzles. So just to use an analogy, if the test here is, is this a duck or a platypus? Well, it seems to look like a feather here. So perhaps I couldn't conclusively say, based on the evidence that this is a feather, that we're looking at a duck. Perhaps it's an eagle. But it at least helps me to say, well, we tend to know that it's not a platypus. It appears to be a bird of some kind. And so that's our position. It's a piece of the puzzle, not the only piece, Your Honor. So with regard to the representation, I'm sorry, I'm dominating here. My colleagues, please interject if you want to stop me. With regard to the representation goals, is there anything in the record to establish when those came into place, vis-a-vis when your client was let go? My memory is that the representation targets had been in place for a few years. I can't tell you off the top of my head when the first date was, but that program and that desire to have representation targets and to achieve them predated the firing. And it seems to be the other side is claiming you waived this whole argument about representation goals by not advancing them either below at the district court or earlier in your briefs. How do you respond to that? I don't think that's quite right. I mean, the part of the record that we cited is a page of this program that includes not just the index that we were speaking about earlier, but also the representation targets. And then the legal argument I was making was not based on, you know, an employer surveying the sentiment of its employees, but rather, you know, hiring goals, soft quotas, things like that, and how measures like that tend to allow an inference that in a specific employee's case, one of the factors behind the employer's decision was a desire to achieve these representation goals based on an impermissible characteristic. Not that it's impermissible to have those characteristics, but impermissible to take that into account in the decision. So we do think that that was discussed in the opening brief sufficiently to apprise Clorox of that position, and they capably advanced arguments to address it as well. Counsel, I'd like to come at this from just a slightly different perspective. So I'd like to distinguish between direct evidence and indirect evidence. So can you tell me what direct evidence of discrimination you're alleging? The case that we've advanced is circumstantial. Okay, so you have no direct evidence. They did not come out and say at any point, I mean, Clorox is a sophisticated— You're not even relying on the statement from the woman who fired him that we're looking for the future, and he says, whoa, this sounds like age discrimination. So there's no direct evidence here. In my view, that would be circumstantial evidence, Your Honor, because one must draw an inference from that type of word to mean, okay, you're starting to talk about age here and impermissible stereotypes about what someone who is 63 is capable of learning. So what is your best circumstantial evidence that is Tony-specific here, as opposed to sort of the general representation DEI goals? I like a lot of our evidence, Your Honor, but if I might start with one, is that his supervisor for most of the time he was there and his colleague, Dan Parkhurst, to this day doesn't know why Jeffrey Tony was fired. Right, but he wasn't part of that decision. However, he did send that e-mail to all of the decision-makers and advocated for Jeff Tony and said why his record wasn't remarkable. Right, but he wasn't in the room. He didn't know how many people were being retained. He didn't look at this company-wide. This was not a single decision. This was a series of decisions. And I think that would be an excellent argument for Clorox to make in front of a jury. That's why we acknowledge that there are competing inferences. What I do think, Your Honor, that you can draw from Mr. Parkhurst's knowledge is he sent out this e-mail. No one responded to it saying you're wrong. You know, you have forgotten that he's not strategic. You have forgotten that you didn't help it along. So we think— But we can always—I mean, sometimes people have to make really hard decisions and they have two good choices and have to choose between two good candidates. If they decided they can only hire one, they can't keep two. Yeah. So I'm not sure how that helps you very much. Have you got anything better than that? What else do you have? I want to make one more pitch from the inference that can be drawn for that and then talk about some of the other evidence. So the reason that there allows an inference is because, well, you can infer had there been respectful disagreement about the merits of Mr. Tony, someone would have responded to that e-mail, but it's never been produced. Mr. Parkhurst had a half-hour-long conversation with Troy Dasher, one of the higher-ups. And Mr. Parkhurst still doesn't know why he was fired. So he would have known if it was, well, respectfully, we think that these are— He's retired. Nobody has to give him an explanation. He wasn't retired at the time, and I think it's reasonable to infer that if there had been an explanation forthcoming available at the time, it would have been given to him. So you're absolutely right. That's one of the arguments that Clorox is free to make to a jury. There's competing inferences that can be drawn here, that while this is a bill and this is an animal that lays eggs, this is a platypus, not a duck. But in our view, you can also look at that and draw from an inference that Clorox had an impermissible characteristic as a substantial factor behind its decision, and that's why no one told Mr. Parkhurst in any comprehensible way the reasoning behind the decision. If I may, I'd like to reserve the balance of my time for rebuttal. Thank you. Good morning, and may it please the Court. My name is Adam Charnas, and I represent Clorox in this appeal. If it's okay with the Court, I'd like to start with the question of the representation targets, because there are sort of three points I'd like to make. First of all, as one of Your Honors mentioned, plaintiffs waive reliance on their representation targets. If you go to their opening brief and you do a search for the word representation or representation target or target and look for all instances in which targets are mentioned, representation targets are not mentioned even a single time. Counsel said, well, we cited the page in the record that discusses representation targets. Well, that page discusses a lot of things, including the inclusion targets, Judge Rodriguez, that you talked about. It's not enough just to cite a page in the record that mentions something if your argument doesn't contain it. The second thing I want to mention is that we don't even know from this record what the representation targets are. Plaintiff took no discovery of the representation targets that are mentioned on a single page of the record. Now, that page exists in the record several times. So when you see in their reply brief that they – the reply brief, when you see where they talk about representation targets, it's got a number of page citations, but it's all to the exact same document, just different places in the record. And in that document, it says we're going to achieve our gender representation target. So doesn't it infer that there is a target? It does not, because it's got a goal and a status. If you look, it's – one of the places it is is 4ER635, the sort of the column under goal. It says achieve our gender and race ethnicity representation targets. Status, it says commitment to establishing enterprise-wide representation targets in fiscal year 2022. Mr. Toney was let go, and the reorg happened in fiscal year 2021. So there is no basis in this record to conclude that the representation targets were in place at the time of the reorganization. Nor do we even know what they are. That's the only reference in this record to representation targets. Are they employment hiring promotion targets that have specific percentages? There's nothing in the record that even says what that is. It's pure speculation by Mr. Toney about what those mean. But it's – but that speculation is irrelevant because the targets were not in place in 2021. So without those targets, those representation targets, he really has nothing but speculation. And in fact, what the Washington courts applying in WLAD cases have specifically said is that speculation and conclusory opinions are not enough. You need specific and material facts that tie the employment decision to discriminatory or anonymous or biased. And there is really nothing here other than Mr. Toney's speculation. The fact that the – and his disagreement with the company's judgment that somebody else was better situated for the job than he was. And now it's perfectly natural and human for him to disagree with that. When the company says, you know, somebody else is better strategically than you are, we're going to give her the position over you, it's natural for him to disagree with that. Well, I mean, it's not just his opinion, right? He's pointed to some concrete facts that maybe support that inference. And so trying to figure out how much does Washington require in order to create a jury question, right? Because he presents evidence that he was a longtime employee. He had several promotions, positive employment or performance evaluations. And then his replacement has much, you know, much more junior, much less experience. Wasn't even applying for the position. So those are concrete facts that we can look at beyond just his opinion of I'm a better employee and to weigh whether that's a valid view or not.  Well, a couple of things, Your Honor. First of all, Ms. Bluchok had as much tenure at Clorox as Mr. Toney did. Now, she was younger than him, but their tenure at the company was exactly the same. But the point is, in Washington cases like Federal cases under Title VII are all clear about this. The question is not whether the company made the right decision, right? Mr. Toney comes in. Most of his brief is, I was a great employee who thought really strategically. Everybody got me wrong except for Parkhurst. But even if the company got it wrong, that's not the question. With the Washington courts, for example, the Mackey case is a perfect example. Home Depot alleged that one of their salespeople, one of their cashiers, was giving improper discounts to customers. They did an investigation. They concluded she was, and they fired her. And she came to court, Washington State court, and said, I wasn't giving those discounts. You're completely wrong. And therefore, it was discriminatory for you to fire me. And what the Washington court of appeals said was, that's irrelevant. The question is not whether you actually violated the discounting policy. The question is whether Home Depot honestly thought that you violated the policy. Even if they were wrong, if they honestly thought that you violated the policy, there's no discrimination. They fired you because of the policy, not because of your sex. And that's the case here. It doesn't matter whether he's right or wrong about whether he was highly qualified and strategic and better than Ms. Blishock at the position that she was going to be. The question is whether they honestly thought that. And there's not a shred of evidence that any of the decision-makers did not honestly think that. The criticisms of Mr. Tony, again, the position changed. He was doing a perfectly adequate job in the position as it was originally defined. The reorg, the company said, we need somebody much more strategic. The position's going to change. They took everybody out of their positions, basically put them on a board, their names, and said, okay, we're going to put people where they belong. Ms. Blishock didn't apply for the job. Nobody applied for any jobs. They didn't even know this reorganization was happening necessarily. People were put in the positions that were best suited to them, according to the company. And every single decision-maker involved testified in this case, in discovery, that they believe that they put her in that position because they believe she was more strategic and was a better fit for the revised position, the regional position, than Mr. Tony was. And, in fact, Mr. Tony, when he was asked at his deposition whether any of these people had ever expressed animus toward him or whether he believed they held animus toward him based on his age, his race or his sex, he answered no. He had no reason to believe and no evidence that any of these people were discriminatory toward him. Unlike almost every other case that he cites, there is no evidence in this record of comments, discriminatory comments, of disadvantageous employment decisions or anything like that. And he — I think he — my friend on the other side conceded that in questioning when he was up here. There's really nothing that Mr. Tony experienced during his employment that would be supportive or even an inference toward discrimination. The only — I see this — I mean, I think this is a really interesting case. You know, we could imagine, maybe at another point in history, maybe not, somebody not hiring someone and giving them the explanation, I just don't think you're the right fit for our clientele. And in context, you could draw an inference, oh, you're black and this is a white community and we don't want this person. You're not going to be a good fit for my clientele. Sounds like a business reason. You dig a little deeper. Maybe it isn't. Why isn't this case sort of — or possibly of that vein, right? Like there's a business reason given. We're restructuring. We're trying to have a new approach to the future or whatever. But the undercurrent of that is — and with evidence of there is this sort of DEI, affirmative action, interest, goal, whatever, why doesn't that context matter in terms of is this business reason sort of not the whole story? Well, because you need evidence. I mean, Washington law is the same as federal law under Title VII. Conjecture, speculation, the employee's belief is not enough. Washington courts have said repeatedly an employee can come to court and say, I was doing a great job, I disagree with my employer's decision. So what evidence could he have that would make this different in your mind, other than just like an admission? Yes, we discriminated against you. I mean, that's not going to happen, right? So what other thing could cross the line in your mind? Well, let's look at some of the cases he cites. In the Scrivener case from the Washington Supreme Court, for example, the college president, who was the hiring decision-maker, repeatedly made public statements about how he wanted to hire young people for positions. And, in fact, he wanted to hire young people without any experience because he was sort of like the young vibe. And he made discriminatory comments to the plaintiff about her age, made fun of her because of her age. And the Washington Supreme Court said in that case, that was enough to get over summary judgment. In the Litvac case, which is the more recent case from the Washington Court of Appeals from last year, the plaintiff presented substantial evidence of on-the-job discriminatory treatment. She testified that women were talked over and cut off and condescended to during faculty meetings. She testified that the scheduling for, she was a doctor for surgery, was biased in favor of men over women doctors. She testified that women surgeons were treated differently during quality improvement meetings. And the main reason she was given for being fired was that she wasn't closing her charts and doing administrative stuff fast enough. They were male doctors who were slower than she was, and no action was taken against them. But she was fired on that basis. So all of that is circumstantial evidence that would lead, that would get you over summary judgment. What are we supposed to do with this language from the Washington High Court and Gamble? WLAD claims, typically inappropriate for resolution at summary judgment because the WLAD mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and non-discrimination that must be resolved by the jury. What do we do with that? I think what you do with that is you have to look at a specific case to see really whether there is any evidence of such inferences. The fact that these cases, generally speaking, are hard to dispose of at summary judgment doesn't mean that every case is hard to dispose of or should not be disposed of at summary judgment. And this is perhaps the unique case where the plaintiff really has no evidence at all about, of discriminatory treatment at all. Would it be sufficient if we sent this back for a jury to be able to see the faces and hear the testimony of Clorox officials who were in the room and made those decisions?  I think, you know — A jury couldn't assess their credibility as they're being cross-examined? Well, certainly a jury could if the case went to a jury, but if that were the basis to get over summary judgment in employment discrimination cases, every case would go to a jury. Again, Washington seems to have a pretty liberal policy of suggesting that summary judgment is not appropriate and that these cases ought to go to a jury. I'm just asking, if we were to send this back, I'm sort of wondering, what would a jury do? Well, Your Honor — One thing that they might do is look your clients' — your clients' managers in the face and see whether they thought they were credible as they were testifying that it was, you know, all due to, you know, predictions about competencies and, you know, future capacity and so on. Well, I mean, I suppose that's true. That's what a jury could do. But, again, if you sent every employment case to a jury so the jurors could look at the defendant's witnesses and see whether they believed them, then all these cases would go to trial. I want to emphasize the fact that this is a case applying State law does not mean that Rule 56 applies with any less — with any less force. In fact, as this Court has held, in diversity cases of all sorts, Federal Rule 56 and the Federal Rule 56 standards apply just — just as equally, even though it's coming from — even though the law is coming from State court. So he — so Mr. Troni needs evidence. He needs evidence sufficient for a reasonable jury to rule for him, and we think the district court got it right that there is no such evidence in the record. There may be another case that this Court hears, maybe it's on your docket now, maybe in the future regarding DEI policies and how they're applied in specific cases, that would get to a jury. But that's not this case, because — Do you think that a company has decided to put a focus and emphasis of value on DEI objectives in and of itself as a relevant fact? No. And the Washington Supreme Court has said so. In the Scribner case, they say the fact that there's a diversity policy in place is not enough unless it specifically impacted the employment decision. In the Fourth Circuit in Duval, which, you know, may be the best case for the plaintiffs because of its context, the Fourth Circuit itself said the same thing. In a footnote, they said — in footnote 10, they said companies may utilize diversity policies. They just can't take adverse employment decisions based on race, sex, or other immutable characteristics using those policies. So the fact that there's a diversity policy in place is not enough to get over summary judgment. If it were, then every lawsuit against, you know, a Fortune 500 company would get to trial because virtually every company has a diversity policy in place. And so that by itself, that's not enough. You have to — the plaintiff has to tie that diversity policy to the specific employment decision. And that wasn't the case here. All the evidence is from all the decision-makers was that diversity, race, sex, age had nothing to do with the decision at all. If the court has no further questions, I'll thank the court for — Thank you. Your Honors, I'd like to quickly address Washington's legal test and then discuss the facts. So just to clarify, under Washington's mixed motive standard for liability, which is a substantive standard, my client doesn't have to disprove every legitimate reason that Clorox has offered. So even if Clorox honestly believed one or more of the reasons that it's offered and could be deemed legitimate, my client still can win if an impermissible characteristic was nevertheless a substantial factor behind the decision. So Clorox's argument depends on a legal standard that we simply do not have to meet. Another point to further address Judge Bybee's discussion about, well, what circumstantial evidence is available. Again, we have a circumstantial case, and that's why we proceeded under Washington's version of the McDonnell-Douglas burden-shifting framework, because that's what's appropriate when there's circumstantial evidence that's the basis for the claim. So if there were direct comments about discriminatory motives or about how Clorox's decision-makers didn't like people who were older or male or what have you, then that would be a direct evidence case. So that, again, is setting a legal hurdle that we simply don't have to  Now, talking about the circumstantial evidence over here, and again, it's a puzzle and these are pieces, is that we have a high-performing employee who is entrusted with the largest sales desk at Clorox with one of its most important retailing partners and was entrusted in that position for years. He met or exceeded all of his sales goals. And while after the fact, someone from the business unit and sales planning in a litigation declaration said, well, there were always concerns about his collaboration with business units, the feedback that he received in his performance reviews was that he was collaborating well with the business units. And so that brings us to the question, well, don't we have to defer to Clorox's business judgment? Well, if that were the rule, it would be impossible to establish discrimination when you're dealing with a sophisticated employer. I think a competing inference is, well, this justification is so incorrect, a jury may find, that it wasn't the legitimate reason motivating it. Or it's merely trying to hide from the fact that there's a substantial factor that's impermissible. State of the evidence in terms of the last point that your friend across the aisle was trying to make about there's no connection between this particular employment decision and the DEI policies or goals of the company. And your response to that is, I don't need a connection because it exists and we can take the inference that it's in the minds of all the decision makers? I have two responses to that, Your Honor. One is that the particulars of a diversity policy matter. So this isn't a broad statement of we value people of all backgrounds and we want people to be themselves. And we're going to have a non-discrimination policy. We're going to provide equal opportunity. That was the statement that was at issue in Scrivener. Here, we have a discussion about representation goals. And then we have the CEO talking about... Come up with any evidence to establish that that was in place at the time your client was let go? I'm hearing 2022. The termination was 2021. I think I'm going to need to follow up with the court on the specific date because as I sit here, I don't have memorized the date that was on the written policy that's in the records, Your Honor. But I'm out of time. But if I may address the rest of your question about the DEI policy is that there is a nexus. And again, it's one piece of the puzzle and it is relevant. And relevance is a low threshold to meet. If that was the only thing we had, maybe we wouldn't get to a jury. But we do think here, okay, you have this policy. We want to have representation targets. It's important to Clorox. All of the executives, the executive team has compensation tied to them meeting their ESG goals. The CEO has said this is important. We need to look out for gender parity. And when the CEO speaks, I presume that the people who are underneath her follow the orders. But she's speaking that statement. She's making that like two or three years after your clients let go. Isn't that correct? I think that's true. But that's certainly, I think, an inference can be drawn from that relevant information that this was an attitude that she had beforehand, particularly when that's coupled with the broader DEI policies that are on paper. So it's nevertheless probative. Just in the way if we had someone with a racial discrimination claim and three years later, you know, the person who made the decision was making derogatory remarks on the basis of race, well, you could say, you know, zebra doesn't change its stripes. That's probative of what his attitude was at the time. All right. We've taken you over. Any other questions from the court? Thank you, counsel. All right. The matter of Jeffrey Toney v. The Clorox Company is submitted, and I thank counsel for their helpful arguments.
judges: BYBEE, FORREST, Rodriguez